UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE EMILIA GRAGES, Administrator for the Estate of Kimberly Jane Donovan, Deceased, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 4:19-cv-01141 |
| v. | (SAPORITO, M.J.) |
| GEISINGER HEALTH (a/k/a Geisinger Health System), et al., | |
| Defendants. | |

## MEMORANDUM

In this *pro se* civil action, the plaintiffs[1] have asserted a federal claim for damages against defendant Geisinger Medical Center ("GMC"), under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. *See generally Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a federal court's obligation to liberally construe the filings of *pro se* litigants);

---

[1] The plaintiffs are Jane Emilia Grages and Mark James Donovan. Grages brings this suit both in her individual capacity, as mother of the decedent, and in her role as administrator of the decedent's estate. Donovan brings this suit in his individual capacity only, as father of the decedent.

*Grages v. Geisinger Health*, Civil. No. 4:19-CV-1141, 2020 WL 1151452, at \*2–\*3 (M.D. Pa. Mar. 10, 2020) (Doc. 26) (construing the complaint in this action to include an EMTALA stabilization claim). In addition, the plaintiffs have asserted state-law tort claims against GMC and the other defendants: Geisinger Health; Susan Baro, D.O.; Jaewon Ryu, M.D.; David Feinburg, M.D.; and Jennifer Roy, P.A.[2]

The defendants have jointly moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Doc. 41.) This Rule 12(c) motion is fully briefed and ripe for disposition. (Doc. 42; Doc. 44.)[3]

---

[2] We have construed the *pro se* complaint as having asserted an EMTALA stabilization claim against GMC alone. EMTALA provides an injured plaintiff with a cause of action against a "participating hospital" for failure to stabilize the plaintiff's medical condition prior to transfer or discharge. *See* 42 U.S.C. § 1395dd(b)(1), (c)(1), (d)(2)(A). "Other than 'participating hospitals,' EMTALA does not provide for causes of action against individual physicians, physician groups, or any other medical entity." *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 656 (E.D. Pa. 2010). Thus, we decline to construe the *pro se* complaint as having asserted an EMTALA stabilization claim against any of the other defendants named in the *pro se* complaint. The plaintiffs have asserted state-law tort law claims only against these other defendants.

[3] Two of the defendants (Dr. Ryu and Dr. Feinburg) have also separately moved for dismissal of state-law claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 33.) Because that motion relied on information and affidavits beyond the complaint

*(continued on next page)*

I.  **ALLEGATIONS OF THE COMPLAINT**

At the time of her death, the decedent, Kimberly Jane Donovan ("Kimberly"), was a 25-year-old first-year law student. On June 27, 2017, she was transported by "life flight" helicopter to the trauma center at GMC for emergency medical treatment. Kimberly was subsequently admitted as an inpatient and underwent surgery to repair orbital fractures caused by blunt force trauma to the head.[4]

Eight days later, at about noon on July 5, 2017, Kimberly was discharged from GMC. At the time of her discharge, she was prescribed several medications, including methadone (Dolophine), fluoxetine (Prozac), and gabapentin (Neurontin). Kimberly was transported home

---

itself, we entered an order converting it into a motion for summary judgment instead, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. (Doc. 36.) The summary judgment motion is fully briefed and ripe for disposition as well. (Doc. 34; Doc. 37; Doc. 38; Doc. 40.) But in light of our dismissal of the plaintiff's lone federal claim, we have declined to exercise supplemental jurisdiction over the plaintiffs' state-law claims, rendering the motion for summary judgment moot. *See infra.*

[4] We note that the complaint states merely that Kimberly was "admitted" to GMC. Based on the eight-day duration of her hospital stay and the surgical treatment she received during that time, we infer from this that Kimberly was admitted as an inpatient, rather than on "observation" status. *See generally Dicioccio v. Chung*, 232 F. Supp. 3d 681, 683, 687–88 (E.D. Pa. 2017) (explaining the distinction between "inpatient" and "observation" status for EMTALA purposes).

by her mother, Grages.

Upon returning home, Grages noticed swelling in Kimberly's head around the surgical area, and Kimberly complained to Grages about throbbing pain in her head. Kimberly went to sleep at approximately 12:30 a.m. on July 6, 2017. Grages slept beside her in the same bed and checked on Kimberly periodically throughout the evening. At approximately 3:00 a.m., Grages checked on Kimberly, who appeared to be fine.

At approximately 7:00 a.m. on July 6, 2017, Grages found Kimberly lying in bed with no pulse. Grages began to perform CPR and called 911. Kimberly was pronounced dead by paramedics at 7:50 a.m. on July 6, 2017. The county coroner subsequently found the cause of Kimberly's death to be an accidental overdose and respiratory depression due to multiple toxicities. A postmortem drug analysis confirmed the presence of therapeutic levels of methadone, fluoxetine, and gabapentin in Kimberly's bloodstream.

The plaintiffs claim that the lethal combination of methadone, fluoxetine, and gabapentin prescribed to Kimberly upon discharge from GMC was the proximate cause of her death. In particular, they allege

that defendant Roy, a physician assistant supervised by physician-defendant Baro, prescribed methadone to Kimberly "without an associated diagnosis." Based on this, the plaintiffs claim that GMC failed to stabilize Kimberly's medical condition following emergency medical treatment, in violation of EMTALA, 42 U.S.C. § 1395dd.

## II.   LEGAL STANDARD

The defendants have answered the complaint and moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Under Rule 12(c), a court must accept all factual averments as true and draw all reasonable inferences in favor of the non-moving party." *U.S. Fid. & Guar. Co. v. Tierney Assoc., Inc.*, 213 F. Supp. 2d 468, 469 (M.D. Pa. 2002) (citing *Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir. 1980)); *see also Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc.*, 513 F. Supp. 2d 157, 163 (M.D. Pa. 2007) ("When deciding a motion for judgment on the pleadings, the court is directed to view 'the facts presented in the pleadings and the inferences drawn therefrom in the light most favorable to the nonmoving party.'")

(quoting *Hayes v. Cmty. Gen. Osteopathic Hosp.*, 940 F.2d 54, 56 (3d Cir. 1991)). In deciding a Rule 12(c) motion, we may also consider "matters of public record, and authentic documents upon which the complaint is based if attached to the complaint or as an exhibit to the motion." *Chemi SpA v. GlaxoSmithKline*, 356 F. Supp. 2d 495, 496–97 (E.D. Pa. 2005); *see also Kilvitis v. Cty. of Luzerne*, 52 F. Supp. 2d 403, 406 (M.D. Pa. 1999) ("In deciding a Rule 12(c) motion, however, a court may take judicial notice of any matter of public record."). Ultimately, "[a] party moving for judgment on the pleadings under Rule 12(c) must demonstrate that there are no disputed material facts and that judgment should be entered as a matter of law." *U.S. Fid. & Guar.*, 213 F. Supp. 2d at 469–70 (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988), and *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir. 1991)).

### III. DISCUSSION

#### A. Federal EMTALA Stabilization Claim

The plaintiffs assert an EMTALA stabilization claim against GMC, alleging that the hospital failed to stabilize Kimberly's emergency medical condition prior to discharging her on July 5, 2017, eight days

after she presented at the hospital's trauma center for emergency medical treatment. The defendants move for judgment on the pleadings, arguing that the hospital's statutory obligation to stabilize Kimberly's emergency medical condition ended upon her good-faith admission to the hospital as an inpatient.

"Congress passed EMTALA to curb the problem of patient dumping by creating a statutory duty for hospitals to examine and treat individuals who come to them for emergency care." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 177 (3d Cir. 2009), *as amended by* 586 F.3d 1011 (3d Cir. 2009). "EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition,[5] and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992 (9th Cir. 2001). To state a "stabilization" claim, "EMTALA requires that [a plaintiff] (1) had an emergency medical condition; (2) the hospital actually knew of that condition; and (3) the patient was not stabilized before being transferred [or discharged]." *Torretti*, 580 F.3d at 178 (internal quotation marks omitted).

---

[5] The plaintiffs do not raise an EMTALA screening claim here.

"Critically, EMTALA defines 'to stabilize' as 'to provide such medical treatment of the [emergency medical condition] as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result *from or occur during the transfer* of the individual from a facility . . . .'" *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 535 (4th Cir. 2020) (quoting 42 U.S.C. § 1395dd(e)(3)) (emphasis and alterations in original).[6] "Thus, under the statute itself, 'the stabilization requirement *only* sets forth standards for transferring a patient in either a stabilized or unstabilized condition. By its own terms, the statute does not set forth guidelines for the care and treatment of patients who are not transferred.'" *Id.* (quoting *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2002)).

"[T]he stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead

---

[6] Subject to limited exceptions, EMTALA explicitly prohibits the *transfer* of an individual with an emergency medical condition that has not been stabilized, 42 U.S.C. § 1395dd(c)(1), but the statute further defines a "transfer" to include the *discharge* of an individual from the hospital as well, *id.* § 1395dd(e)(4). *See Williams*, 952 F.3d at 535.

transfer the patient to a hospital that could and would undertake that treatment.*" Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996). Thus, "[a]fter an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be converted into a federal malpractice statute, something it was never intended to be." *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1169 (9th Cir. 2002) (internal quotation marks and alterations omitted); *see also Baker*, 260 F.3d at 993 ("The statute is not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice.").

Subsequent regulations from the Centers for Medicare & Medicaid Services ("CMS"), promulgated in 2003, confirm the limited scope of the stabilization requirement:

> If a hospital has screened an individual . . . and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d)(2)(i).[7] "[I]mportantly, the regulations refer to an admission that is 'in good faith.' Thus, while the CMS clarified that admission is a defense to a stabilization claim, it, at the same time, imposed a good faith requirement to that admission." *Williams*, 952 F.3d at 536. Thus, "a hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with no intention of treating the patient, and then inappropriately transferring or discharging the patient without having met the stabilization requirement." EMTALA Final Rule, 68 Fed. Reg. 53,222, 53,245 (Sept. 9, 2003);[8] *see also Williams*, 952 F.3d at 537 ("The good faith requirement simply clarifies that any admission must be legitimate and not in name only.").

---

[7] *See Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 177 (3d Cir. 2009) (finding CMS's interpretation of EMTALA is entitled to *Chevron* deference). *See generally Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (holding that when an agency with the power to construe a statute has provided a construction, a federal court will defer to that interpretation if it is "permissible"); *see also Mercy Home Health v. Leavitt*, 436 F.3d 370, 377 (3d Cir. 2006) (explaining the *Chevron* deference test).

[8] *See Dicioccio v. Chung*, 232 F. Supp. 3d 681, 688 (E.D. Pa. 2017) (giving "substantial deference" to CMS's interpretation of its own regulations implementing EMTALA). *See generally Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("[A federal court] must give substantial deference to an agency's interpretation of its own regulations.").

"The vast majority of courts that have considered a hospital's duty under EMTALA since CMS promulgated the regulations have given the regulations controlling weight, or have cited them in support of finding that a hospital's duty under EMTALA ends upon admitting a patient in good faith." *Thornhill v. Jackson Parish Hosp.*, 184 F. Supp. 3d 392, 399 (W.D. La. 2016). We join them here. "EMTALA was clearly enacted to address a distinct and rather narrow problem—the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them. Once a hospital admits a patient in good faith, that concern has been addressed and state medical malpractice law supplies the relief." *Id.* at 401 (citation and internal quotation marks omitted); *accord Williams*, 952 F.3d at 536 n.4 ("[A] hospital has no obligation under EMTALA to stabilize a patient's emergency medical condition once the patient is admitted. Instead, relief for any criticisms of treatment fall in the area of state medical malpractice law."); *Dicioccio*, 232 F. Supp. 3d at 687 ("[B]ecause EMTALA was intended as a limited solution to the practice of 'patient-dumping,' rather than as a federal malpractice statute, its stabilization obligations do not extend beyond the emergency room and the good-faith admission of a patient precludes an EMTALA

claim.").

Under these regulations, EMTALA liability may only attach when a hospital ostensibly admits a patient "with no intention of treating the patient and then inappropriately transfer[s] or discharge[es] the patient without having met the stabilization requirement." EMTALA Final Rule, 68 Fed. Reg. at 53,245. Thus, a party claiming an admission was not in good faith must plausibly allege that the hospital admitted the patient solely to satisfy its EMTALA obligations with no intent to treat the patient once admitted, and then immediately transferred or discharged the patient. "In other words, the standard requires [allegations] that the admission was a subterfuge or a ruse. The standard is not satisfied by simply alleging or showing deficiencies in treatment following admission." *Williams*, 952 F.3d at 537.

Here, accepting the allegations of the *pro se* complaint as true and drawing all reasonable inferences in favor of the plaintiffs, it is clear that Kimberly's admission as an inpatient was not a subterfuge or ruse to avoid EMTALA liability, but rather she was admitted to the hospital in good faith for further treatment of her medical condition, which included surgery and an eight-day hospital stay. As articulated in the complaint,

the circumstances of Kimberly's death arise from the allegedly negligent medical treatment that she was affirmatively provided while hospitalized for inpatient treatment (and upon discharge), and not from the hospital's stabilization—or failure to stabilize—her emergency medical condition. As previously noted, "EMTALA does not generally provide a vehicle for claims that are at their core malpractice in nature." *Williams*, 952 F.3d at 538; *see also Dicioccio*, 232 F. Supp. 3d at 686 ("While EMTALA actions are usually brought in conjunction with state-law claims such as medical malpractice or negligence, EMTALA 'does not create a federal cause of action for malpractice.'") (quoting *Torretti*, 580 F.3d at 173).

Accordingly, the plaintiffs' federal EMTALA stabilization claim will be dismissed for failure to state a claim upon which relief can be granted, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Moreover, in light of the facts alleged in the *pro se* complaint regarding the decedent's admission as an inpatient and the surgical and other medical treatment she received during her hospital admission, this claim will be dismissed with prejudice and *without* leave to amend, as any amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

**B. State-law Tort Claims**

Upon dismissal of the plaintiffs' EMTALA stabilization claim, only their state-law tort claims against GMC and the other defendants will remain. Where a district court has dismissed all claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state-law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350. Finding nothing in the record to distinguish this case from the ordinary one, the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See Cohill*, 484 U.S. at 350 n.7. In particular, we note that the plaintiffs commenced a parallel case against these same defendants in state court the day after filing their complaint in this federal action, and that state court case

remains pending. Accordingly, the plaintiff's state-law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

For the reasons set forth above, the defendants' motion for judgment on the pleadings (Doc. 41) will be granted. The plaintiffs' federal EMTALA stabilization claim will be dismissed with prejudice for failure to state a claim upon which relief can be granted, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The plaintiffs' supplemental state-law tort claims will be dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3). In addition, the motion for summary judgment by defendants Ryu and Feinburg will be denied as moot.

An appropriate order follows.

Dated: March 9, 2021          ***s/Joseph F. Saporito, Jr.***
                                              JOSEPH F. SAPORITO, JR.
                                              United States Magistrate Judge